UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,

    Plaintiff,

v.

SCOTT L. RENDELMAN,

    Defendant.

Case No. 09-cr-40051-JPG-1

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendant Scott Rendelman's ("Rendelman") Motion for Evaluation (Doc. 95) and Motion to Appoint (Doc. 97), to which the Government filed a Response (Doc. 101). This matter also comes before the Court on Rendelman's Motion for Subpoena (Doc. 99). The Court will address each of Rendelman's motions in kind.

### I. Motion for Evaluation

First, Rendelman asks to be psychologically evaluated by Dr. Kevin Miller ("Dr. Miller") for purposes of sentencing. Rendelman believes that Dr. Miller will issue favorable opinions on his dangerousness and diminished capacity, thereby warranting a downward departure and/or downward variance from his sentencing range under the United States Sentencing Guidelines ("U.S.S.G.").

#### A. Dangerousness

Rendelman's motion makes clear that he has been evaluated for dangerousness no less than five times over the last twenty years. His most recent evaluation occurred in 2007. All of the evaluators — all of whom were medical or mental health professionals — opined that Rendelman presented little to no dangerousness. And, in this case, Dr. Miller previously opined that Rendelman does not and has never been a risk of physical harm to others. The Court agrees

with the Government that another evaluation would not only prove unnecessary but cumulative. Further, as discussed *infra*, the defense may question Dr. Miller as to Rendelman's dangerousness at sentencing. Accordingly, the Court finds an evaluation for purposes of determining dangerousness to be wholly unwarranted.

B.  **Diminished Capacity**

In hopes of requesting a downward departure via U.S.S.G. § 5K2.13, Rendelman also moves to be evaluated by Dr. Miller for diminished capacity. Section 5K2.13 states, in pertinent part, as follows: "A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense." The corresponding commentary note further explains that "significantly reduced mental capacity" applies to a defendant who "has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." U.S. Sentencing Guidelines Manual § 5K2.13 cmt. n.1 (2009). It has been held that a defendant must establish an inability "to process information or to reason" if he is to meet this definition. *United States v. Goossens*, 84 F.3d 697, 701 (4th Cir. 1996); *see United States v. Johnson*, 979 F.2d 396, 401 (6th Cir. 1992). When considering a defendant's request for a downward departure at sentencing, a district court should consider "not whether [the defendant] suffers from a defined disorder, but whether he was impaired in his ability to control his actions." *United States v. Lange*, 445 F.3d 983, 986 (7th Cir. 2006) (affirming district court's denial of downward departure request in light of syndrome akin to Asperger's Syndrome).

Diminished capacity only applies to crimes where specific intent is an element of the offense. *United States v. Ricketts*, 146 F.3d 492, 498 ("Diminished capacity, applying as it does only to specific intent crimes, is an extremely limited defense. Intent to commit a crime is almost always a question of fact for the jury to decide based on the life experiences and common sense of its members.") (guilt phase). *See United States v. Rinaldi*, 461 F.3d 922, 927-28 (7th Cir. 2006) (sentencing phase). As such, in the case at bar, Rendelman would *only* be eligible for a downward departure on the charges of the Superseding Indictment (Doc. 45) that required a finding of specific intent, namely Count I (criminal contempt of court), *see United States v. Patrick*, 542 F.2d 381, 389 (7th Cir. 1976), and Counts II-IV (retaliating against a federal official), *see United States v. Watkins*, 151 F.3d 1034, at *3 (7th Cir. 1998). As will be seen, however, there are at least three reasons why another evaluation by Dr. Miller is unnecessary.

1.      **Rendelman's Testimony at Trial**

During his cross-examination at trial, when asked whether he knew what he was doing when penning the underlying letters, Rendelman indicated that he knew what he was doing and was doing so knowingly. While he could choose not to write the letters, Rendelman testified that a powerful sense of obligation created by his conscience compels him to continue doing so. In fact, Rendelman made clear that his conscience compels him to write progressively horrible things. At trial, Rendelman promised that his letter writing campaign would continue, and the content of his letters would only get worse. Rendelman stated on the record that he could sometimes stop writing to particular persons, although he could not stop altogether. Curiously, upon his release from prison in 2001 and during his subsequent term of supervised release, Rendelman stopped authoring threatening letters entirely.

Here, in light of Rendelman's relevant testimony at trial and his general defense throughout this prosecution, it is obvious that another evaluation by Dr. Miller is unnecessary. While an immense compulsion or duty of conscience may drive Rendelman to write threatening letters, the Court does not believe that he is impaired in his ability to control writing them. Rendelman has quit writing to specific individuals in the past, and he quit writing letters entirely upon his release from prison in 2001 and throughout his term of supervised release. Any argument as to "pure" compulsion is undermined by this curious selectivity.

Rendelman's "burglar" analogy, which he discussed at trial in an effort to explain how he feels when he writes the letters, does not appear to help him either. One may feel as though they "must" or "have to" protect their family from a burglar with homicidal intentions, but that pang of conscience does not typically remove control over the situation from the individual. Not only that, but Rendelman acknowledged control over his actions to the extent that he is able to withhold writing the most heinous and depraved things possible until he deems them fit for mailing. In other words, the broad, contemplative intent that underscore's Rendelman's letter-writing campaign is a far cry from the mental state of a father who discovers a maniac standing over his sleeping daughter.

Finally, even though Rendelman has exhibited a great deal of stubbornness throughout his letter-writing campaign, he has not displayed an inability to process information when he puts pen to paper. Rather, Rendelman testified under oath that he writes these letters while fully aware of what he is doing.

### 2. Rendelman's Previous Evaluations in This Case

There are other reasons why Rendelman should not be evaluated for diminished capacity, not least of which are the psychological findings already rendered in this case. Shortly after the

original indictment was returned with one count of contempt of court, Dr. Miller evaluated Rendelman and discovered that he "overvalues his own ideas . . . [and] lacks psychological mindedness." Miller Report, p. 17. Dr. Miller further determined that "Rendelman meets the general criteria but does not meet the specific criteria for a named personality disorder. In fact, . . . he does not meet even the criteria for any specific personality *trait*." *Id*. (emphasis in original). Meanwhile, Dr. Christina Pietz conducted a mental evaluation of Rendelman and issued a forensic report indicating, *inter alia*, that he is fully competent and does not suffer from a mental illness.[1] On February 24, 2011, Rendelman consented to the terms of said reports.

Put simply, Rendelman's previous evaluations in this case demonstrate that another evaluation by Dr. Miller is not warranted. Although the Court is well-aware that one can be competent for purposes of trial yet have suffered from diminished capacity at the time they committed a crime, the thorough reports of Dr. Miller and Dr. Pietz do not reasonably suggest that Rendelman suffered from diminished capacity when he committed the underlying offenses. In fact, the existing reports demonstrate that any additional evaluation would be, at best, cumulative. Moreover, Dr. Miller's previous evaluation and report should provide Rendelman with an adequate basis on which to question the doctor at sentencing about diminished capacity.

---

[1]Although Dr. Miller evaluated Rendelman long before the existence of the threatening letter counts, his report acknowledged Rendelman's history of writing threatening letters as "the background [of] the [then-]current charge" and frequently discussed them in its observations and findings. Miller Report, p. 16. In other words, Dr. Miller considered Rendelman's letter-writing campaigns, as well as the letters themselves, to some extent in his initial evaluation and report. Moreover, there is no reason to believe that Rendelman's obstinancy and stubbornness regarding the Court's orders, which provided the basis for the contempt conviction, should not apply with equal force and effect to his letter-writing. Similar logic applies to Dr. Pietz's report.

5

### 3. Forecasting as to the Results of Another Evaluation

Lastly, the Court finds that another evaluation by Dr. Miller would most likely be a waste of time and taxpayer money. Rendelman has not provided the Court with any specificity about what the doctor may testify other than what he *hopes* the doctor will discuss and diagnose. Rendelman conceded as much at the pretrial motion *in limine* hearing. Such forecasting simply does not warrant another psychiatric evaluation. One of the Court's many roles is to serve as a diligent steward of taxpayer dollars, and the Court would not be fulfilling this role if it permitted Rendelman to be evaluated a third time. Accordingly, Rendelman's motion for a psychiatric exam shall be denied.

All of this is not to say that it will be impossible for Rendelman to convince the Court at sentencing that he suffered from diminished capacity regarding Counts I through IV. Again, Rendelman will be given an opportunity to call Dr. Miller at disposition and attempt to elicit testimony that will lend credence to his diminished capacity argument. At this time, however, the Court finds a § 5K2.13 downward departure to be both unwarranted and unlikely, thereby warranting denial of Rendelman's request for another evaluation.

## II. Motion to Appoint

Next, Rendelman requests that Assistant Federal Public Defender Melissa Day ("Day") be appointed to his cause for purposes of sentencing. Rendelman seeks the appointment of Day primarily because her office can afford to pay for an additional evaluation by Dr. Miller. Of course, for reasons discussed *supra*, the Court will not be ordering another evaluation by Dr. Miller; as such, the impetus underlying the instant motion is essentially moot. Further, this matter is firmly set for disposition on July 14, 2011. The Court will not indefinitely delay an end to this prosecution because original defense counsel unnecessarily reenters the case, especially

when she withdrew from representation nearly a year and a half ago. Finally, it is highly likely that Day has an unavoidable conflict of interest in this matter because two of her fellow assistant federal public defenders were called by Rendelman at trial. Being fully advised of the premises, Rendelman's motion to appoint shall be denied.

### III. Motion for Subpoena

Rendelman also moves to subpoena Dr. Miller for purposes of the sentencing hearing. As mentioned above, the Court believes that Dr. Miller can testify at sentencing, but he shall do so via videoconference.

### CONCLUSION

For the foregoing reasons, the Court **DENIES** Rendelman's Motion for Evaluation (Doc. 95) and Motion to Appoint (Doc. 97). The Court **GRANTS** Rendelman's Motion for Subpoena (Doc. 99), whereby Dr. Miller shall testify at Rendelman's sentencing via videoconference if so called.

**IT IS SO ORDERED.**
**DATED: June 28, 2011**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**